You don't bring up any new arguments in your rebuttal time. And with that, we'll call the first case of the morning. And it's Christopher Jerome Ware v. Louisiana Department of Corrections. Mr. Trento. You didn't get a haircut for this occasion, did you? Why do you ask? I actually did. Thank you, Judge Prado. Members of the panel, may it please the Court. Of all of the relevant evidentiary burdens in this case, there's no dispute that my client, Mr. Ware, complained of. Well, no, wait a minute. I can actually turn you up. Do I need to move this closer? Whether you want to be turned up or not. Have you got the right microphone?        Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. We're good. We're good? Yeah, good. Okay. Thank you. As I mentioned, all of the relevant burdens in this case were borne by the defendant, the Department of Corrections. There's no dispute that Mr. Ware has a genuine belief that his Rastafari religious beliefs compel him to maintain his long dreadlocks. There's no dispute that the application of the defendant's grooming policies, which apply without exception, would substantially burden Mr. Ware's exercise of those religious beliefs. Let me ask you a question. Is there a picture of either him or someone that looks like him, i.e. with dreadlocks, in the record? There are three pictures of him that were taken at various points over the course of his pre-conviction incarceration in the record, and I'd be happy to get those. Will they show dreadlocks? They will. One of them. At least one of them. One of them does? Possibly two. Okay. And is there evidence in this record of, not necessarily him, but somebody hiding something in a dreadlock? I mean, what do you hide in one of these things? There was discussion at trial about the kinds of things that might be hidden in a person's hair. Oh yeah, but hair is one thing. Dreadlocks is something else. So what evidence is there in this record of how someone hides something in a dreadlock? I am asking because I'm unfamiliar. No, that's a very fair question, and the evidence is as follows. As the Court is aware, and as this Court has held, that this analysis has to be done on an individualized basis. Every case is different and needs to be examined within the context of a particular plaintiff seeking a particular exemption. And in this case, there's unrebutted testimony from Mr. Ware that if he were to try to insert something into his dreadlock, they would fall apart. And so the actual within the dreadlock is not a place that's at all feasible for him to try to hide things. Now the dreadlocks are clumped together, and there was testimony from the Department of Corrections witnesses that, well, he might be able to, you know, just put things in there and conceal them, and there was testimony from the Department of Corrections witnesses that the various methods by which Mr. Ware suggested that his hair could be searched and that it has, in fact, been searched in the past, would not be effective. But there was no specific evidence, no hard evidence, no specific testimony about a witness's recollection or experience that they ever witnessed or experienced somebody with dreadlocks hiding something in their hair. Now does the record show that these dreadlocks are, I don't know how you'd describe this, what you'd call naturally forming in the sense that if you grow your hair out, mine just looks dreadful, but it just hangs like straight, but is that this hair forms itself naturally into dreadlocks, or does he have to work at that? What Mr. Ware does, what he testified to, was that when he washes his hair, he keeps the dreadlocks separated at the scalp. Otherwise, I think naturally what they would do is all clump together. And so he does do some work to make sure that the dreadlocks stay separate, but otherwise the hair dreads on its own. Dreads, that's the word. It fits. If it is, then I got it right, but I may have just made that verb up. Okay, thank you. So the burden was borne by the defendant to prove that its grooming policies furthered that its grooming policies, again without exception, were the least restrictive means of doing so. This is no small point. The Supreme Court in Holt made clear that this is an exceptionally demanding standard and requires a prison system not merely to explain why it denied a requested exemption, but to prove that it lacked the means of achieving its compelling interests except for the use of those policies. For this reason, courts in this circuit have consistently tested a prison's asserted interests against the accommodation being sought rather than simply defer to the say-so and putative expertise of those who manage prisons. The prison system has put forward the, I guess, evidence maybe, that's one of the issues, that having to do with expense and the parish jails don't require, they apparently don't have hair length restrictions, is that right? Let me address that question first. Do that first. The district, I'm sorry, the Department of Corrections has promulgated policies relating to the grooming of its offenders, but it has not extended those policies to the parish jails. So the parish jails don't have them? Parish jails have whatever the parish jails feel are things that they need to have, but it's not something that's mandated by the Department of Corrections. And if they were going to require, the problem here has to do with the length of his hair, and if they were going to require, I gather, and if they were going to require shorter hair, then that's expensive because they just have to keep cutting it. They're the ones that cut it, the prisons or the jails. So is that where the expense issue comes from? I don't believe that that evidence is in the record. I would suggest that because there is a hair length limitation on every prisoner, every prisoner needs to have their hair regularly cut, otherwise everybody would have hair grown long. So I'm not sure that that would pose an added burden, but that wasn't an issue that was raised below, and so I don't believe it's in the record, that that is the expense concern. As I understand it, and obviously my brother will speak to what the Department's position, but as I understand it, the record reflects that the concern about burden was that it would, for people with long hair and people with dreadlocks, it would take a little longer to search them. Everybody gets searched when they come back into the prison, people on work crews, people that go out for events in the community, and so somebody with longer dreadlocks takes, in my view, and I believe the record shows, marginally a bit more time to search than somebody without dreadlocks and whose hair conforms to the current policy. Well, the policy we're talking about is a length problem, right? It's a length rule? There are two components of the policy that are at issue in this appeal. There is a length rule. The length, I think the requirement is that it can't be below the shirt collar in the back, and there's also a style policy. I think the style policy is a little more vague, but it says that, I want to get the language right, but there cannot be extreme hairstyles. So dreadlocks, under that rule, dreadlocks have been ruled out no matter whether they're too long or not too long? That's my understanding, and that's the position the department has taken in this case. Obviously the record here has to do with somebody with long dreadlocks, but yes, that's my understanding. So in this case, the district court erred because it failed to appropriately, to adequately under the precedence of this court and of the Supreme Court, to test the asserted interests of the Department of Corrections against the risks and the accommodation, the risks and costs of the accommodation being sought in this case. But, but you would concede that there are some compelling interests of some sort in this case? Without a doubt. We don't dispute that in the abstract, of course there's a compelling interest in reducing contraband within a prison. Of course there's a compelling interest in offender identification, but the department has to show that its policies further those interests, and not only that, but it has to show that the policies that it has adopted, the fact that it doesn't allow exemptions to these policies for people who can demonstrate a substantial burden on the basis of religious exercise. It has to show that these policies are the least restrictive means of furthering those interests. Let me make sure I understand what the evidence is in this case, individually reviewed. It seems to me one of the biggest problems that we have to deal with with this policy, however we come out of this, this is potential under-inclusiveness. It's not just long hair on men, long hair on women. It's not just dreadlocks. So it seems to me, is there no evidence in this record that long hair is in fact a convenient used location to hide contraband and weapons, shanks or whatever would be light enough to stay in, it seems to me braided dreadlocks, if they're ever braided, would be a good place to hide a stiffer weapon of some sort. Is there no evidence that hair is in fact a place used by prisoners to hide things that need to be found? There are not specific examples in the record, but there is evidence in the form of testimony by the Department of Corrections witnesses that yes, hair can be used to hide things and yes, men are likely to use hair to hide things. Were they speaking from, as a 15-year veteran of this particular jail or prison or wherever they were speaking from, I have encountered that? They were speaking from their experience, again, I don't want to speak from these witnesses, but the record reflects that the policies, in effect, the current policies and substance were put into place at some point in the 90s. There was not clear evidence as to when it happened. And the testimony that was elicited was based on the experience of the witnesses. That's all I can really speak to. I would guess that dreadlocks make it more difficult to, if it was just a matter of long hair, you can run your fingers through there or a comb, but because they're dreadlocks, it's more difficult to search through the hair. Yeah, the record reflects that there are ways to search dreadlocks. What the plaintiff testified to is that he will bend over and shake his hair and then a corrections officer will just squeeze his hair in clumps to see if anything is in there. And that's, in his experience, has proven effective in the past, and I believe the district court found that dreadlocks can be searched, and the issue was that the search would be unduly burdensome because it would take more time. And we submit that the actual evidence in the record points to the fact that it would be anything but unduly burdensome to conduct those kinds of searches. There's evidence that there's, I guess, under-inclusive people because you have half the people that are incarcerated that should be in the custody of the Louisiana Corrections are in parish jails, and they're not obligated to be under this rule. Does this evidence of under-inclusiveness alone justify a preliminary injunction, or is that just one of the factors that we need to take into account? Judge, I think under the precedence of this court and of the Supreme Court, it alone justifies imposition of an injunction or the award of judgment to the plaintiff, reversal of the district court in this case. The reason is that it goes to whether the policies in question satisfy the prong of the test that they further the compelling interests at issue. Again, we don't dispute that all four of the issues on this appeal, contraband, identification, hygiene, and preventing violence, those are compelling interests in the abstract. The issue is whether these policies further them, and the fact that the Department of Corrections, 50% of its offenders due to overcrowding are housed in parish jails. As we've discussed, the parish jails have all manner of different policies that affect care. The parish jails and the Department of Corrections together have promulgated a set of 100 guidelines, over 100 guidelines that provide the minimum standards for the administration of these jails that house DOC offenders. These, again, are offenders that are in the legal custody of the DOC. The DOC is responsible for their security and well-being, but they are housed in parish jails to deal with overcrowding. Those 105 provisions, the basic jail guidelines, deal with contraband, they deal with searches, they deal with hygiene, they deal with admissions. Yeah, but what I gather, what, I mean, I don't know this, but I would think that the politics between the Department of Corrections and the people running the parish jails may be a sensitive area. And so, if the Department of Corrections says, okay, we're going to put half of our inmates down there with you, and you need to be sure that they cut their hair the way they're supposed to, you know, they may have decided they don't want to put that burden on the, and the question is, is there any evidence in this record that that's an issue as between the Department of Corrections and the people who run the parishes, parish jails? One of the issues in the record is, in fact, that, Your Honor. According to Secretary LeBlanc, the Sheriff's Association has specifically requested that the Department of Corrections not impose its grooming standards on their jails. So it's a political issue, and it's probably also an expense issue for the parish jails. Well, I would submit that the fact that the parish jails, it's not that they will tolerate them, that they specifically do not want them underscores how unimportant, ultimately, they are to furthering the interests of contraband control identification. Well, you don't know whether it's a matter of whether they're unimportant or whether it's a matter of they line up all their various issues with the Department of Corrections and they say, well, this is a problem, but we're not going to fight, we're not going to, you know, and we're going to fight over this one, or we're not, you know. And to that I would respond, the Department of Corrections has taken no effort, they have not explored, they have not considered whether it would be feasible to prioritize putting DOC offenders in those jails that do have these kinds of. Do the people in the parish jails, I mean, I take it that they can have dreadlocks all they want, as far as the people running the parish jails are concerned. Mr. Ware was housed in a parish jail, Caddo Correctional Facility, and for several years he was permitted to have long dreadlocks. I can't speak for what all of the other parish jails do. I presume that they have different policies, just as different policies may exist in different states throughout the country. But again, the point is that DOC could have considered, if these were so important to the safety and security of the public, of these inmates that are in DOC's custody, they could have said, well, if you guys aren't going to do that, if these certain jails aren't going to do that, we're going to make sure we put our offenders for whom we are responsible in those jails that have these kinds of policies. Okay, one last question. Yes. To what degree are the people who run the jails also responsible for the state prisoners that are? Well, the people that run the jails are responsible for administering their prisons, their jails, according to the requirements set out by the Department of Corrections and the basic jail guidelines. They're audited regularly by the Department of Corrections for compliance with those, and they are required to abide by that. So they are responsible in that sense. The fact that the DOC has not, they have not included haircut requirements in those basic jail guidelines, I think is telling. Thank you. Thank you. Thank you, Jonathan Vining on behalf of the Department of Corrections. Your Honors, obviously we're here asking that you would uphold the district court's decision that found that the department's grooming regulation was the least restrictive means to achieve various compelling interests, including the control of contraband, offender identification, the prevention of prisoner violence, and health and hygiene. Let me ask counsel. Yes, sir. The record is complete. I mean, there was a two day or whatever it was, length of time, bench trial, injunction was denied, complaint dismissed. If we have any issues that we think might affect the resolution by the district court, we do have a complete record. Yes, sir. Okay. No, you do. I mean, I guess one of the things that I want to address that Judge King brought up was the evidence about hiding things in contraband. And I guess it presents a couple of issues for Louisiana, but I've got an answer for that. This grooming policy has been in place for 30 years. So essentially, for our prisons, within our prison system, the short hair policy, if you want to call it that. No, there would be no evidence in Louisiana of having done that, however, because they wouldn't have the hair to do it. However, Warden Goodwin did testify that he's worked for us long enough, he remembers when there wasn't a grooming policy. And he had personal experience, as he stated on the record, with searching dreadlocks. And he was the one that stated, while he couldn't attest to the fact that he remembered in the 80s or early 90s, if somebody had put contraband like a needle or a pin or any various form of object drugs inside dreadlocks. He did offer extensive testimony, but I remember it when there was no hair policy. And he also stated that he believed the hair policy was instrumental in preventing the flow of contraband into the prison once it was implemented. And that it had been to great effect. So, is there documentary evidence from other states where we polled various states or things of that nature? No, there's not. We did not do that, but there is testimonial evidence from Warden Goodwin that contradicted things that were stated by Mr. Ware's expert saying that I don't personally believe, based on my experience, my 34, 35 years having searched dreadlocks, that they can be effectively searched at all. And what he stated is that even to do a minimally effective search, which, I mean, even based on plaintiff's own expert, would be to take each dread. And Mr. Ware's dreads, if you were to see him, are down to his waist. And so these are thick locks of hair that run down to his waist. I believe the district court noted that he had perhaps some 16 of them or somewhere of that nature. You'd have to take each dread and bend it like this, all the way down. And while Warden Goodwin stated that, well, that would certainly find, you know, a pin, which, I mean, could easily be slipped into a piece of hair or some piece of metal, if it were cash, a pill, you know, any other various forms of contraband you could think of, he stated that he would not be able to detect it because those dreads have the consistency of rope. So it wouldn't be like my hair if I grew it all the way out. These are thick bunches of hair that, again, run all the way down to his waist. And as stated by Mr. Ware, he has no intention of ever cutting his hair. And I think that's what separates this case from this Court's recent decision in Ali and the Supreme Court's decision in Holt, where each one of these people sought some form of a measured exemption, a half-inch beard, okay, a four-inch beard for Ali, okay. But this is, I don't ever want to have to cut my hair again. And I'm not going to cut my hair. And I'm going to keep these dreadlocks. But it was, you conceded it was for religious purposes, and that is religion had the belief that you should not cut your hair. A hundred percent. Yes. No, there's no argument with that at all. But I just think that that is the difference in the cases is that, again, you know, I think that it sort of goes back to this Court's decision in Ali, which I believe bolsters our position, because the shoe's just on the other foot this time, in the sense that you had differing experts that offered conflicting testimony on the stand. The trial judge is the trier of fact, if he sided with us, necessarily found our experts to be more and ruled in our favor. And I think that if you look at this Court's decision in Ali, it would say the exact same thing, just from a reverse perspective, whereas it was the plaintiff that was able to get his experts to convince the trier of fact that, no, you know, we're right in this case. So you thought Ali was a pretty well-written opinion? I do. I've already done the research, and I know that there were a couple of judges on the same panel. But what— Let me ask you about that well-written opinion, which I certainly agree with. It seems to me, as I told your friend on the other side, that one of the biggest problems to me is under-inclusiveness in this case. And our newest Supreme Court justice keeps being quoted in Yolo Bair when he wrote about that on the Tenth Circuit. So what do you say to that? I mean, you have women having long hair in the jail, Paris Jail, with no grooming policies at all. How do you support the compelling interest when you have these sorts of variations? Let me answer that this way, Judge Southwood. I'll do the women briefly, because this Court's looked at that issue, and I have to tell you that our testimony on that, about the women, was substantially similar to what Texas presented, in that the women are just, if not the same, concerned. They don't bring in the same types of contraband. I think that the testimony that we presented was essentially unopposed by Warden Moore, that it's, I mean, forgive me, it's lipstick, it's makeup, it's things of that nature, and they just don't have the same violent tendencies with the men that we're talking about. Now, with regard to the men that are housed in local facilities and state prison systems, there's a good answer for that. And here is the reason they're treated differently. The people that are housed in local systems and parish jails are of a particular type, okay? If you're serving less than 20 years for a non-violent offense, non-sex offense, you're eligible to be housed on the local facility. Up to 20 years? Less than 20, yeah. Anyone serving less than, well, we're in Louisiana. If you're serving less than 20 years. That's a short sentence? Unfortunately. But we're fixing that. Maybe you're following the legislative session. We're getting there. But these people are considered low-risk offenders. They are not the types of people that are housed in state prisons. Because of the way this state prison system is set up, where half of the people are housed at the local level, the only people that are eligible to be housed in a state prison are people serving more than 20 years. These are violent offenders. These are sex offenders. If you're in for a violent offense or a sex offense, the very demographic profile that you're worried about bringing in contraband, you're going to be housed in a state prison. So violent offenders and sex offenders don't get sentences of less than 20 years in Louisiana? No, sir. I would not say that. But I would tell you that if you are a violent offender or a sex offender, absent some strange request from a sheriff, there we go again with the Sheriff's Association, you are not going to be eligible to be housed on the local level. Let's say it's an armed robbery and they give you, I think, the minimum is 10 years. You're not going to be housed in a parish jail. We would not approve that. A sheriff could request that. That is not the type of person that we're looking at. Again, I would say that we view the people that are housed on the local level as, again, exceedingly low-risk drug offenders. It's a different demographic of people. They're not the same.  You know, weapons, whatever it may be. It's the same thing with the people that are housed on the local level. And I think that's the answer to the under-inclusiveness, you know, question is that they're just not the same. I mean, it's a plausible explanation. It's a reasonable explanation. And it's what our people testify to, that, you know, we're much more worried about the people that are housed at Angola or David Wade in this case, as we were talking about, versus the ones that go to the local level. Two different classes of people. What do we do with the evidence that they presented that says there's, like, over 30 jurisdictions where you don't have these restrictions? What makes Louisiana special or different from these other situations that would require that Louisiana have this regulation of having the haircut? I'll answer that this way, Your Honor. This sort of goes back to what I was just saying a minute ago. I'm not sure how Texas sets up their state prisons. I don't know if they house anybody in local jails. I know California does a few because they've got overcrowding issues. But I can tell you that our state prisons only house violent and sex offenders and people serving extremely long sentences. I can tell you that the testimony that was presented by Warden Goodwin and Secretary LeBlanc stated that they're not sure why these other systems have chosen to, I guess, more or less, accept the risk. But in their opinion, based on their years of experience, and especially Warden Goodwin, who, again, could recall the days before there was a grooming policy, this was necessary for Louisiana and was the only way to achieve that goal. The other thing that I would say, too, as noted by the district court judge, and I know the plaintiff tried to say that there's a budget document that's in the record that sort of shows the cuts from DOC and what we've taken from the state over the last 10 years. It's called, I think, Significant Budget Changes. And the last reply, I believe, the plaintiff stated that even Secretary LeBlanc stated that it was confusing, we're not going to learn a lot from it. I don't think that's entirely true because if you look at the Secretary's testimony, he gave extensive testimony on the record about what's happened with the budget. And it's essentially this, okay? Ten years ago, we were at 40,000 prisoners. We've made some headway in getting some of these people out. We're down to 36,000, okay? That document and the Secretary's testimony shows that we've taken a $50 million budget cut, if you're just looking at raw numbers from today to back then. What it also doesn't show, but what the Secretary talked about, is that included in that number is $50 million additional dollars that was given to us to take care of all prisoners' health care because the state charity hospital system is gone. Governor Jindal saw to shutting that down. So when you look at that, that's not even real money. That's money that was given to us. Now you're responsible for all their health care instead of being able to take them to the charity hospital system. That's essentially a $100 million cut. And then the Secretary goes on to detail other cuts that are not shown in there, basically additional costs we've had to absorb without getting additional money. So again, it goes back to the same thing that we're lower staffed, we have a high turnover rate, we can't offer raises. I mean, the turnover rate at most of these prisons is 30% a year. Angola, while it might be about the same turnover rate, can't even fill positions because it's exceedingly difficult to get somebody to come work as a prison guard for $22,000 a year. I mean, it's a very dangerous job. Well, Counselor, you're talking about some very real problems. Obviously, Louisiana is not alone in that. But you're up against ARLUPA, which is Congress's statement of the significance of religious interests of prisoners. You have conceded the legitimacy, validity of the interest here, but the honesty of the interest here. And as Holt itself said, we must find the least restrictive means consistent with the religious interest, the least restrictive means available. And it does weigh, I think, on, at least to me, that many states have not found it necessary to do what you do in Louisiana. It does seem to me there's a specific concern about dreadlocks because of the stiffness of them, perhaps more readily available for hiding objects. But we have the record before us to look at very closely. What would you emphasize as to your case? Is it the fact that it's a dreadlock case, or is it something else? Your Honor, taking this analysis as, I guess, the Supreme Court and this Court has and as applied to this specific plaintiff, it's a dreadlock issue. It's a dreadlock issue with regard to Mr. Ware. I mean, I guess it's conceivable that I could think of another plaintiff out there that may be a better plaintiff. But as far as Mr. Ware... Pointing at his hair? Or what were you pointing at? No, I'm not pointing at his hair. I was just saying, please don't sign up anymore. Go pick Mississippi next time. But no, it's conceivable that there's somebody else that may make a better argument. I'd look at this Court's decision with a four-inch beard. But in Mr. Ware's case, as applied to him, what he's asking for, a complete and unlimited exemption to... I mean, he says his hair is just going to stop growing at some point, and I don't know how that would be the case. But yes, with regard to Mr. Ware, it's a dreadlock issue. Does the record show how many inmates from the Rastafarian faith are incarcerated in Louisiana? I mean, is he the only one? Are there 10 of them or 15 of them? It is in the record. I don't have the site for you, but it's 178. There's a list, a breakdown, and when you see it, it breaks everybody down by their various religious faiths, or if they choose not to choose any religion. And those are for state prison facilities, so that wouldn't include people at the local level. But it is 178. I think maybe 90% of those are housed in Angola, I believe. But yes, there is. There is a breakdown of that. The record, what's the record evidence about other inmates, for example, using hair as a part of beating up on somebody? Your Honor, again, it's difficult. I'm sorry, I didn't mean to interrupt you. It's difficult in this state, other than the testimonial evidence that was given by Warden Goodwin, from when there was no grooming policy at all, so we're talking 30 years ago, and Secretary LeBlanc about inmates being prone to grab hair and fight during a fight. Now, there was a lot of evidence about how the male offenders that are housed in state prison facilities are more prone to, I guess, get into fisticuffs, get into fights, and their fights tend to be, as Deputy Warden Moore stated, much more violent, much more physical. It's hard to point to anything in the last 30 years because, I mean, it's this. I mean, I guess you could grab that, but basically my hair would essentially meet the requirement. But we don't have anything other than what Warden Goodwin stated, would have occurred prior to that, and that they're prone to do that. And in Mr. Ware's case, I mean, it would seem to me that that would be exceedingly dangerous because, again, it's exceptionally long. And to the point where it's so long, I mean, somebody could even take a dread and wrap it around his neck if they wanted to, or vice versa with him. And I don't mean to implicate him in any sort of way, but that's just the reality of where we are. Let me go to a couple of other things that I know that Mr. Ware brought up I guess to try to show that maybe we were treating religion differently than other things. And I think that the record pretty fairly reflects that there's a Department of Reg and they're dealing with religion. I mean, how accommodating we are for this. I mean, we make a lot more exceptions than even what the great state of Texas does. But one of the things they pointed out was contact visitation. You know, that's a method for entry of contraband. Or what about boots and socks and shoes and pockets? And I think that the testimony that was given by Warden Goodwin and by the Secretary showed that all those serve very, very functional purposes. And that's not to slight an individual's religious interest in wanting to have hair that complies with what their faith requires or requests. But the visitation, according to the Secretary, is exceptionally important for helping these people to adjust to being in prison, to ensure that when they're ready to reenter society that they're on a good level. They found it to be very beneficial to people before they get out, to have contact visits, to keep their spirits up. With regard to the other items, such as boots, socks, you know, pockets and things like that, this is Louisiana. And those are all very functional things. I mean, these guys, even though they may be prisoners, they need pockets to carry things around with, as Warden Goodwin stated. You have to have socks because these guys work. I mean, these are hard labor sentences. You have to have shoes. You can't get rid of everything to control every single aspect of it to make sure there's no contraband. But you do the best you can. And, you know, we get it down to the point where you've got the bare essentials of stuff that you have to have. But if there are other ways that we can look at it to make sure that, you know, we can stop this from coming in by somebody not being allowed to have hair down to the floor, then, I mean, that's something that obviously, you know, we chose to look at. Or to be compelling, I'm trying to think it's up to both sides to put on whatever evidence is necessary, was there any evidence as to the amount of contraband either in Louisiana or in other states that comes in in this way as opposed to either myriad of other ways that since you don't allow long hair, I don't think you've probably stopped the contraband problem in Louisiana prisons. Is that a fair assessment? I can certainly understand. Is there any sort of analysis of, I mean, if one, I mean, we're looking at religious rights here. If almost never is something hidden in hair in any state, but it is hidden in all sorts of other ways and still comes in, it seems to me that's a huge part of how compelling the interest is. Is there any evidence like that in this record? Your Honor, there is certainly evidence in there that shows how much contraband we pull up or how much we confiscate on a monthly basis. I don't know that there's nothing in there that would compare Louisiana to any of the other states. I mean, this is just our evidence, but when you look at the numbers and they're labeled CO5 reports, and there's a lot of them in the record that show the type, the nature, how it was found, whether it was a visitor, staff, you know, a prisoner. But again, it's not going to show anything from hair because, you know, that's just not, that's not an option right now, but it shows everything else, I guess I would say. I was wondering about comparison to other states that don't have your rules, if they have much of a problem with contraband coming in this way. You know what, Your Honor, I cannot speak to that other than what our witnesses testified to, that they thought that it would be a problem and they'd seen it to be a problem earlier before there was an implementation of the Gurmey policy. I was going to ask what they do in Jamaica, but... Oh, no, I don't know. Please don't ask me that. With that, if nothing further, I guess I'll take my seat. Thank you, counsel. Thank you. Thank you, Your Honor. A lot of points to hit, but are there any questions the Court would appreciate that I address first before I just jump in? Great. A lot of the testimony that Mr. Vining referred to was that Mr. Ware can hide things in his hair. There are unrebutted testimonies that he can't, because if he tries to put something in the dreadlock, it's going to fall apart. So the dreadlock issue, as presented in this case, is not one that presents an issue about hiding things in the hair. There's no dispute in the evidence that he can't inside the individual dreadlock. I want to say, I mean, there must be a genuine dispute in this evidence. There must be what? Evidence of some, at least, effort by the state to hide things in their hair and show that they will stay? It seems to me that, at some stage, this is a test of whether things can be hidden in dreadlocks, and I expect that they can. It's just how serious is that question here, and how hard would it be to find? But are you saying, as a matter of law, there's no evidence, no fact, that anything can be hidden in his hair? Anything will stay in his hair, I guess, is what you're saying. Yeah, I'm speaking about the specific point about inserting something into the dreadlock. For one, they don't need to be searched individually. They can be searched in clumps. That's what's happened in the past, and there hasn't been any issue. And just so it's clear, the record reflects that Mr. Ware has no issues of violence in his record in this period of incarceration. He has no issues of contraband issues. The record is not such that one would have concerns about him in the first place. But with regard to specifically searching dreadlocks, the issue in this case is not one where there is a risk that he might hide something within an individual dreadlock. The state chose not to challenge him on that testimony. That's unrebutted at this point. If we were to accept your argument, procedurally, are we in a situation where the district court did not properly evaluate the evidence and it would be remanded? Or are we in a position where we would say, no, we vacate in reverse? Judge, I think this court's in a position to vacate in reverse on any of the issues presented on appeal. Would we send it back to the district court to re-evaluate the evidence using the proper standards? Or was it wrong and we just render? I don't think so. And here's why. On the issue about the parish jails, which I want to get to because there were some factual points that I want to address. But on the issue about the parish jails, the district court didn't even touch the issue, didn't find any facts associated with it, didn't make any conclusions of law associated with it. But the record is clear. There are five undisputed facts. I think that, and I don't want to spend the time, I've already gone through them. But there are undisputed facts that permit the court to, on the record before it, reach the issue, address the issue in reverse on that basis. So that would be point one. And on the points the court specifically did address, the specific compelling interest at issue, the court erred as a matter of law by exhibiting too much deference to the testimony of the DOC witnesses in the face of contrary evidence in the record against it. So I think the court is able to reverse on any of those bases. But let me address an issue about the local jails. There's a suggestion that the mix of prisoners at the local jails is different because DOC only sends prisoners who have shorter sentences and less violent convictions to be housed in local jails. But local jails is also where pre-trial arrestees are housed. All mix of prisoners, people charged with the most serious of violent crimes are housed in local jails before they're convicted. And so I think that it's clear that there are both violent and nonviolent offenders that are housed. Are they segregated between the Department of Corrections prisoners and just the ordinary parish jail prisoners in these local jails? Or are they all mixed up together? There's nothing in the record to suggest one way or the other. But there's also nothing in the record to suggest that DOC requires its offenders, as a matter of imposing the basic jail guidelines, to be treated any differently than the people housed who are pre-trial. So I don't think it's clear. Mr. Ware himself has been housed, during the pendency of this case, in a maximum security facility in Bossier Parish. And so the suggestion that there simply aren't violent people housed in local jails, I don't think, is warranted. A point about the costs. I see I'm running out of time. We're not disputing that Louisiana is facing budget issues. The Department of Corrections is facing budget issues. But our loop of statute acknowledges that sometimes an expenditure of resources will be required to provide an accommodation. And here, when we make this clear in our papers, it's clear that there was no effort by the DOC to try to quantify, try to estimate, try to conduct a study of what kind of costs it would face from having to comply, having to provide exemptions in these kinds of circumstances. There were the 178 Rastafarian prisoners. That's about 1% of the population of the DOC. Their chaplain went through that list and identified all of the practitioners of faiths for whom, just based on his understanding of the faiths, might seek an exemption relating to long hair. And that total amounted to approximately 5.5% of the total population of the offenders housed in state facilities. And that's assuming all of them seek exemptions, all of them qualify for exemptions, none of them have any concerns about contraband, recent histories of contraband that might suggest some pause before granting the exemption. But those sorts of numbers do not present, I would submit, this overwhelming burden that can't be absorbed by the system as it currently exists. And we make that, we point that out in our papers, and I would refer to those for more information. Thank you, Mr. Curran. Thank you.